| | | |
|---|---|---|
| 504 REDEVELOPMENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO.: 2:15–CV-288-TLS |
| | ) | |
| SBA SITE MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter comes before the Court on two motions for summary judgment [ECF Nos. 35, 39]. On April 1, 2015, the Plaintiff 504 Redevelopment LLC filed the instant action in state court [ECF No. 4] against SBA Communications Corporation and Prime Investment Management Corporation ("Prime"). The case was removed to federal court and the Plaintiff voluntarily dismissed its claims against Prime [ECF No. 10]. On June 20, 2018, the Court granted the parties' stipulated motion to substitute the Defendant SBA Site Management, LLC, for SBA Communications Corporation [ECF No. 47].

The Plaintiff alleges that the Defendant breached an antenna roof top management agreement relating to property owned by the Plaintiff (Count II), and seeks a declaratory judgment that the agreement is not enforceable against the Plaintiff (Count I), and ejectment of the Defendant from the property (Count III). On February 15, 2018, the Defendant filed a motion for summary judgment [ECF No. 35]. On April 3, 2018, the Plaintiff filed its response to the Defendant's motion for summary judgment, which contained a cross-motion for summary judgment [ECF No. 39 (Pl. Resp.)].[1] The motions have been fully briefed and are ripe for review.

---

[1] By burying its cross-motion for summary judgment in its response to the Defendant's motion for summary judgment, the Plaintiff failed to comply with Local Rule 7-1(a), which requires that motions be filed

# BACKGROUND

In 2010, nonparty EFN Gary Property, LLC ("EFN") owned the commercial building located at 504 Broadway, Gary, Indiana ("Property"). On June 10, 2010, EFN entered into an Antenna Site Roof Top Management Agreement ("Agreement") with Prime pursuant to which EFN allowed Prime to rent roof top and certain interior space of the Property ("Premises") to tenants for purposes of placing equipment that transmits and receives radio communications signals in exchange for the upfront payment of $600,000.[2] [ECF No. 36-2 (Agreement), §§ 2, 5.] The Agreement defines "Premises" as "[t]he areas shown as outlined on the floor plans attached and as further described on Exhibit A together with the non-exclusive right of use of the common areas of the Building and exclusive right of use of the roof except as described herein." (Agreement at 1.) Exhibit A to the Agreement includes a written description of the Premises as well as outlined floor plans of the roof top and floors 7-10 of the building. (*Id*. at SBA000049-54.) The term of the Agreement is 99 years. (*Id*., § 4.)

> Section 8 of the Agreement includes an easement provision:
>
> [A]s consideration for the fee paid under this Agreement, Building Owner [EFN] hereby grants Manager [Prime] an easement in, under and across the Building for ingress, egress, utilities and access to the Premises adequate to install and maintain utilities, which include, but are not limited to, the installation of power, telephone service cable and emergency power generators, to service the Premises and the Communication Facilities at all times during the term of this Agreement (collectively "Easement"). The Easement provided hereunder shall have the same term as this Agreement. . . .

(*Id*., § 8(d).)

---

separately. N.D. Ind. L.R. 7-1(a); *see Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014) ("[D]istrict courts may require parties to strictly adhere to their rules."). The Court will consider the cross-motion, but cautions the Plaintiff to observe the Local Rules in the future.

[2] Also on June 10, 2010, EFN and Prime entered into an Assignment and Assumption of Contracts, which assigned EFN's communication tenant leases to Prime. [ECF No. 39-3.] Thus, Prime owned all of the current communication tenant leases for the Property.

Section 9 of the Agreement requires the Manager to maintain the Premises:

> Manager hereby agrees (a) to keep the Premises in good working order and condition and promptly repair all damage to the Premises or to the personal property of the Building Owner's occupants caused by Manager, its tenants, agents, employees, contractors, invitees or guests and [] (b) not to materially disrupt, adversely affect or interfere with other providers of services in the Building or with any occupants['] use and enjoyment of the Building. In the event Manager does not repair damage to the Premises cause by Manager or its tenants, agents, employees, contractors, invitees or guests as provided in (a) above within twenty (20) days following the receipt of written notice from Building Owner, then Building Owner may make any such repairs it deems necessary and Manager shall reimburse Building Owner within ten (10) days after an invoice for its costs resulting from any such repairs. If Manager fails to reimburse Building Owner as hereinabove stated, then Building Owner shall have the right to terminate (in addition to other rights) this Agreement in accordance with Section 11 below.

(*Id*., § 9.) Section 11 provides that "[t]he following events shall be deemed to be Events of Default by Manager":

> Manager shall fail to comply in any material respect with any provision of this Agreement not requiring the payment of money, and such failure shall continue for a period of thirty (30) days after written notice of such default is given to Manager, provided, however, if such condition cannot be reasonably be cured within such thirty (30) day period, it instead shall be an Event of Default if Manager shall fail to commence to cure such condition within such thirty (30) day period and shall thereafter fail to prosecute such case diligently and continuously to completion within one hundred eighty (180) days after the date of Building Owner's notice of default. . . .

(*Id*., § 11(1).) Upon an Event of Default, the Building Owner has the option to terminate the Agreement, in which event the Manager shall immediately surrender all spaces used by the Manager in the building, including but not limited to, the Premises. (*Id*., § 11(2)(i).) Other available remedies include invoking any remedy allowed at law or in equity, including injunctive relief. (*Id*., § 11(2)(iii).) "Neither party shall be deemed to have waived any obligations by the other party unless such waiver expressly is set forth in a written instrument signed by the other party." (*Id*., § 19.)

Section 15 of the Agreement addresses assignment and subletting: "Manager may assign, sublet or otherwise transfer all or any part of its interest in this Agreement or in the Premises subject to the assignee assuming all of Manager's obligations herein. . . ." (*Id.*, § 15.) Section 18 provides that "[t]he provisions of this Agreement, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns." (*Id.*, § 18).) The Agreement is governed by the laws of the State of Indiana. (*Id.*, § 22.)

EFN and Prime also executed a Memorandum of Roof Top Lease Agreement ("Memorandum") [ECF No. 36-3 (Mem.)]. The Memorandum was recorded in the Lake County Recorder's Office on June 25, 2010. The Memorandum states that EFN and Prime entered into the Agreement for a term of 99 years, and attaches Exhibit A to the Agreement, which describes the Premises and the easement:

> The Premises shall consist of any and all rooftop areas of the [Property] including the penthouse structure located on the roof (Exhibit A-5), all of Suites indicated on Exhibits A-1 through A-4, and the right to utilize an additional 2,500 sq. ft. of reserved space as defined in Exhibit A-4. Building Owner further grants Manager a non-exclusive easement over and through the Building for the placement of transmission lines, utility lines, cable bridges and utilities from the Roof Top to its Equipment Shelter or to existing utility services necessary for the operation of Manager's or Manager's tenant's Communication Facilities.

(Mem. at SBA000061.) It also includes the highlighted floor plans of the building.

On or about September 22, 2010, Prime assigned all of its rights, title, claim and interest in the Agreement to the Defendant via an Assignment and Assumption of Roof Top Lease ("Assignment Agreement").[3] [ECF No. 36-4.] The Assignment Agreement was recorded in the Lake County Recorder's Office on October 7, 2010. (*Id.*)

---

[3] Prime entered into the Assignment Agreement with AAT Communication, LLC. AAT changed its name to SBA Site Management, LLC, soon thereafter. [ECF No. 36-5.]

In early 2014, the Plaintiff purchased the Property from EFN. [ECF No. 39-10 (Kenney Aff.), ¶ 2.] The Plaintiff was aware of the Agreement when it purchased the Property. (*Id.*) The Plaintiff reviewed the Agreement as part of its due diligence in acquiring the Property, and was aware that the Agreement's fee had been prepaid.

On March 19, 2015, the Plaintiff sent the Defendant a Notice of Demand for Information, Site Repairs, and Cure of Material Breaches ("Demand Letter"). [ECF No. 36-7 (Demand Letter).] The Demand Letter asserts that the Defendant was in default of the Agreement for failing to maintain portions of the Premises in a safe, clean, and orderly fashion. It attaches two written assessments of the Premises. The assessment dated April 11, 2013, suggests maintenance to the lattice towers on the Premises ("2013 Assessment"). The assessment dated February 18, 2015, suggests repairs and maintenance to several areas on the Premises ("2015 Assessment").[4] The Demand Letter demands that the Defendant perform all necessary maintenance and repairs raised by the assessments within twenty days pursuant to section 9 of the Agreement, and states that it considers the failure to perform the required maintenance to be a breach of the Agreement under section 11. It asserts that the breaches "must be cured within thirty (30) days of this Notice." (*Id.* at 2.)

The Defendant hired a contractor who conducted the repairs and cleanup work on the Premises. On April 1, 2015, the Plaintiff signed an acknowledgement of the contractor's site clean-up activities and failed to note any new conditions found as a result of the site clean-up

---

[4] At the time of the Demand Letter and thereafter, the Defendant's power lines, condensers, communications cabling, and equipment occupied space from the building's basement to the rooftops. (Kenney Aff., ¶ 4.) Its communication cabling covered the rooftops and ran from the rooftops on the exterior of the building into windows and doors throughout the upper floors. Its power wires traveled down the core of the building into the basement, and its condensers rested on the fourth floor roof.

activities. [ECF No. 36-9 (Acknowledgement).] On that same day, the Plaintiff commenced this action in state court [ECF No. 4 (Compl.)].

The Plaintiff's managing partner Vance R. Kenney ("Kenney") testified that all needed repairs had been remedied at the point of his deposition in September 2017. [ECF No. 36-6 (Kenney Dep.) at 53.] His affidavit states that "[w]hile [the Defendant] commenced some remedial action within the given time period, a substantial majority of necessary repairs and maintenance were completed long after the thirty day period allowed by the Lease." (Kenney Aff., ¶ 3.)

## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence that creates a genuine issue of material fact." *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "A party may

not defeat a properly focused motion for summary judgment by relying on evidence that is less than significantly probative." *Id*. (citations and internal quotation marks omitted). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491--92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citation omitted). When cross-motions for summary judgment are filed, "[e]ach movant has the burden of establishing the absence of any genuine issue of material fact on its own motion." *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002) (citation and internal quotation marks omitted).

## ANALYSIS

### A.      Validity of the Express Easement

Count I of the Complaint seeks a declaration that the Agreement is invalid and unenforceable because it lacks sufficient detail regarding "certain easements, rental space, rents, assignments, access and maintenance, among other terms, that relate to the use of the Property by [the Defendant] and/or the Subtenants." (Compl., ¶¶ 10--11.) The Defendant asserts that the terms of the Agreement are valid, certain and enforceable, and sets forth the specific terms of the Agreement. [ECF No. 36 (Def. Br.) at 6-9.] In its cross-motion for summary judgment, the Plaintiff argues that one term of the Agreement is invalid and unenforceable: the express easement.[5] "An easement is the right to use the land of another." *Terry Weisheit Rental Props.,*

---

[5] By failing to respond to the Defendant's argument that other terms of the Agreement are definite and enforceable, the Plaintiff has abandoned those claims. *See Palmer v. Marion County,* 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that a party abandoned his claim where he failed to delineate the claim in

*LLC v. David Grace, LLC*, 12 N.E.3d 930, 936 (Ind. Ct. App. 2014) (citation omitted). "An instrument creating an express easement should describe with reasonable certainty the easement created and the dominant and servient tenements." *Oakes v. Hattabaugh,* 631 N.E.2d 949, 951 (Ind. Ct. App. 1994) (citations omitted); *see Lennertz v. Yohn*, 79 N.E.2d 414, 417 (Ind. Ct. App. 1948) ("A reservation of an easement is not operative in favor of land not described in the conveyance."). An express easement is invalid where it "fail[s] to name any dominant tenement or specify that the easement was created in favor of any particular landowner." *Oakes*, 631 N.E.2d at 951. The Plaintiff argues that the easement is not enforceable because it does not reference a dominant or servient estate, and does not include any legal descriptions, deed restrictions, or measurements.

Section 8(d) of the Agreement describes the easement as follows:

[A]s consideration for the fee paid under this Agreement, Building Owner hereby grants Manager an easement in, under and across the Building for ingress, egress, utilities and access to the Premises adequate to install and maintain utilities, which include, but are not limited to, the installation of power, telephone service cable and emergency power generators, to service the Premises and the Communication Facilities at all times during the term of this Agreement (collectively "Easement"). The Easement provided hereunder shall have the same term as this Agreement [99 years].

(Agreement, § 8(d).)

Indiana courts have recognized that the purpose of a description of dominant and servient estates "is not to identify the land but to furnish the means of identification." *Kopetsky v. Crews,* 838 N.E.2d 1118, 1125 (Ind. Ct. App. 2005) (citations omitted). Thus, "if we can identify the dominant tenement with reasonable certainty based upon the language of the deed, we are not

opposition to a motion for summary judgment); *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived).

required to find a direct description of that tenement in the conveyance." *Id.* at 1126. Where, as here, the terms dominant and servient estate "are not expressly mentioned in a document, a valid easement nevertheless exists if the document adequately describes the dominant and servient estates." *Tanton v. Grochow*, 707 N.E.2d 1010, 1013 (Ind. Ct. App. 1999) (citation omitted). "[I]n construing an alleged creation of an easement through grant or reservation, no particular words are necessary; any words which clearly show the intention to give an easement are sufficient." *Id.* (citing *Chase v. Nelson*, 507 N.E.2d 640, 642 (Ind. Ct. App. 1987)).

Citing the Agreement as a whole, the Defendant maintains that it contains a legal description that identifies the dominant and servient estates. The easement provision states, "Building Owner hereby grants Manager an easement in, under and across the Building for ingress, egress, utilities and access to the Premises adequate to and maintain utilities . . . ." (Agreement, § 8(d).) This language clearly evidences the parties' intent to grant an easement.

The Plaintiff contends that no dominant estate exists because the Defendant owns no real estate adjoining the Plaintiff's property. However, Indiana courts have considered leased property to be a dominant estate. *See, e.g.*, *Shadeland Hills Dev. Co. v. Westel-Indianapolis Co.*, No. IP 00 1758-C-T/K, 2002 WL 31431571, *4 (S.D. Ind. Sept. 25, 2002) (addressing a "conveyance of a leasehold interest *in the dominant estate*, i.e., it gives [the lessee] the power to sublet *the Leased Premises*") (emphasis added). Here, the Agreement grants the Manager the "right to rent the Premises to tenants for the transmission and reception of radio communication signals . . . and for the installation, maintenance and operation of necessary facilities." (Agreement, § 2.) The "Premises" is defined as "[t]he areas shown as outlined on the floor plans attached and as further described on Exhibit A together with the non-exclusive right of use of the common areas of the Building and exclusive right of use of the roof except as described herein."

(*Id*. at 1.) Exhibit A to the Agreement, which was attached to the Memorandum filed with the Lake County Recorder, describes the Premises and the easement:

> The Premises shall consist of any and all rooftop areas of the Building including the penthouse structure located on the roof (Exhibit A-5), all of Suites indicated on Exhibits A-1 through A-4, and the right to utilize an additional 2,500 sq. ft. of reserved space as defined in Exhibit A-4. Building Owner further grants Manager a non-exclusive easement over and through the Building for the placement of transmission lines, utility lines, cable bridges and utilities from the Roof Top to its Equipment Shelter or to existing utility services necessary for the operation of Manager's or Manager's tenant's Communication Facilities.

(Mem. at SBA000061.) The descriptions of the Premises in the Agreement and Memorandum may not be artfully drafted, but they do provide a means of identifying the dominant tenement. *See Kopetsky,* 838 N.E.2d at 1126 (holding that the description contained in the deed, though not artfully drafted, provided a means of identifying the dominant tenement benefited by the easement). The Agreement and Memorandum also inherently identify the Plaintiff's property as the servient estate because they describe the easement as being located in the building owned by the Plaintiff. *See Larry Mayes Sales, Inc. v. HSI, LLC*, 744 N.E.2d 970, 973 (Ind. Ct. App. 2001) (where deed described the location of the easement, "since the easement is located on the Mayes' property, it inherently identifies the Mayes' property as the servient tenement"); *Oakes*, 631 N.E.2d at 952.

Turning to the legal description of the easement, "[a]n instrument creating an express easement should describe with reasonable certainty the easement created . . . ." *Oakes*, 631 N.E.2d at 951 (citing *Lennertz*, 79 N.E.2d at 449). The Agreement describes the easement as "in, under and across the Building . . . for ingress, egress, utilities and access to the Premises adequate to install and maintain utilities. . . ." (Agreement, § 8(d).) The Memorandum is similarly vague as to the easement's location, describing "an easement over and through the Building for the placement of transmission lines, [etc.,] from the Roof Top to its Equipment

Shelter or to existing utility services. . . ." (Mem. at SBA0000614.) These nebulous descriptions do not sufficiently describe the location of the easement. *See Lennertz*, 79 N.E.2d at 450 (finding a written agreement did not create an easement where there was "no attempt to describe the location of the drive referred to"). Therefore, the Court finds that neither the Agreement nor the Memorandum create a valid easement.

### B.     The Assignability of the Agreement

The Plaintiff argues that the leasehold interest in the Agreement cannot be assigned to the grantees of EFN because it is a personal contract with EFN to lease the Premises, enforceable only by the original parties to the Agreement. In other words, the Plaintiff contends that the leasehold interest is not a land use covenant that runs with the land. *Cf. Weisheit*, 12 N.E.3d at 936--37 (finding so-called easement to be an affirmative covenant that ran with the land). "Land use covenants may be either personal, in which case they may be enforced only by the original parties to an agreement, or they may 'run with the land' and be enforceable by 'remote grantees,' that is, subsequent parties who acquire interests in the land." *Id.* at 937 (citation omitted). To determine whether a covenant runs with the land, courts first ask "whether the covenant is one which may run with the land under any circumstances." *Id*. (citations omitted). Here, the parties do not dispute that the covenant is one that may run with the land under any circumstances. Courts "next look to whether the parties' intention, as expressed in the agreement containing the covenant, was that the covenant would run with the land." *Id*. (citation omitted). "A covenant that imposes an affirmative burden runs with the land if: '(1) the covenantor and covenantee intend it to run; (2) the covenant touches and concerns the land; and (3) there is privity of estate

between subsequent grantees of the original covenantor and covenantee.'" *Id.* (quoting *Columbia Club, Inc. v. Am. Fletcher Realty Corp.,* 720 N.E.2d 411, 417 (Ind. Ct. App. 1999)).

**1.      *The parties to the Agreement intended the covenant to run with the land.***

The parties' intent that their covenant should run with the land "must be determined from the specific language used and from the situation of the parties when the covenant was made." *Weisheit*, 12 N.E.3d at 937. The parties' intentions must be determined from the contract read in its entirety. *Columbia Club*, 720 N.E.2d at 419. "[N]o particular language is required to demonstrate an intent to run with the land." *Id.* (citation omitted). "[A] real covenant may exist without the words 'assigns' or 'grantees' but when these or equivalent words are used, they become persuasive of the intent of the parties." *Id.* (citation omitted).

Under the terms of the Agreement, the Manager (Prime) leased the Premises located on EFN's Property. Section 8(d) grants the Manager an express – albeit invalid – easement in, under and across the building "for ingress, egress, utilities and access to the Premises adequate to install and maintain utilities. . . ." for 99 years. (Agreement, §8(d).) Section 15 contemplates the assignment of the Manager's obligations, and section 18 provides that the Agreement's provisions "shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns." (*Id.*, §§ 15, 18.) Moreover, the Memorandum of the Agreement was recorded with Lake County Recorder soon after the parties executed the Agreement.[6] *See* Ind. Code § 32-21-4-1 ("A conveyance, mortgage, memorandum

---

[6] The Plaintiff does not deny that it had constructive and actual notice of the Agreement prior to acquiring the Property. *See In re Canaday,* 376 B.R. 260, 268 (Bankr. N.D. Ind. 2007) (noting that recording constitutes constructive notice). It does not explain why it conducted itself as landlord for over a year, including sending the Demand Letter pursuant to the terms of the Agreement, before arguing that the Agreement was not binding on the Plaintiff.

of lease, or lease takes priority according to the time of filing."). These facts support the parties' intent that the Agreement run with the land. The Plaintiff asserts that the Agreement was not intended to run with the land because it has a term of 99 years. The Court disagrees. At least one Indiana court has found that a covenant's term of 25 years "support[ed] the conclusion that the covenantors' intent was that the restrictive covenants were to run with the land." *Oakes*, 631 N.E.2d at 952. The substantially longer 99-year term similarly supports the conclusion that the parties intended that the leasehold interest would run with the land. Given the language of the Agreement and the recording of the Memorandum, it is improbable that EFN and Prime intended the Agreement to be purely personal and not binding on subsequent grantees of the land. Thus, the Court finds that the facts surrounding the Agreement and the language used in it demonstrate an intent to create a covenant running with the land.

2. ***The Agreement touches and concerns the land.***

"[T]he 'touch and concern' requirement ensures that one purchasing land will be bound by his grantor's contract only where the contract has some logical connection to his use and enjoyment of the land." *Columbia Club*, 720 N.E.2d at 420 (citation omitted). "The clearest example of a covenant that 'touches and concerns' the land is one which calls for a party to do, or refrain from doing, a physical act on the land." *Id*. The Plaintiff does not dispute that the Agreement touches and concerns the land. Nor can it. Under the Agreement, the Manager leases the Premises, and is allowed access to the Premises adequate to install and maintain utilities, and service the Premises and its communications facilities. (*See* Agreement, § 8(d).) As the Defendant notes, without the covenant provided in section 8(d), the Defendant could not operate the communications facilities on the leased Premises that it is entitled to operate under the

Agreement. Because the Agreement relates to the parties' rights to use the leased Premises, it touches and concerns the land.

### 3.	There is privity of estate between the subsequent grantees and the original parties to the Agreement.

"[I]n order for benefits and burdens of a covenant to devolve upon successors in interest there must be privity of estate between the parties." *Columbia Club*, 720 N.E.2d at 421. There are two types of privity under Indiana property law: horizontal privity and vertical privity. *Id*. There is no dispute that horizontal privity exists here.[7] Rather, the Plaintiff contends that vertical privity does not exist. "Vertical privity . . . is established where the party seeking to enforce the covenant and the party against whom it is to be enforced are successors in title to the property of the covenantee and covenantor respectively." *Id.* at 421 (citing *Moseley v. Bishop*, 470 N.E.2d 773, 777 (Ind. Ct. App. 1984)).

The Plaintiff maintains that the Agreement's assignment provision prevents privity of estate between subsequent grantees of the original covenantor and covenantee. Under the Agreement, the original covenantor EFN was landlord to covenantee Prime. Section 15 of the Agreement provides: "Manager [Prime] may assign, sublet or otherwise transfer all or any part of its interest in this Agreement or in the Premises subject to the assignee assuming all of Manager's obligations herein. . . ." (Agreement, § 15.) This provision expressly permits Prime to assign the Agreement. No similar assignment right was expressly provided to EFN. Citing no supporting legal authority, the Plaintiff maintains that EFN could not assign the Agreement, and

---

[7] Horizontal privity is generally established by evidence that the original parties to the covenant had some mutual or successive interest either in the land burdened by the covenant or the land benefitted by it. The requirement of horizontal privity may be met by proof that the covenantee has a leasehold and the covenantor has the reversion in the affected land. *Columbia Club*, 720 N.E.2d at 421 (citation omitted).

thus, the Agreement allegedly prohibits EFN from creating privity as a landlord to subsequent title holders. In other words, the Plaintiff contends that because EFN could not assign the Agreement, the Plaintiff does not have the same landlord-tenant relationship with the Defendant that EFN had with Prime. But section 18 of the Agreement states that "[t]he provisions of this Agreement, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, *successors* and permitted assigns." (*Id*., § 18 (emphasis added).) The Plaintiff ignores the term "successors" in this provision, and focuses on the "permitted assigns" as those permitted only by Prime.

The Defendant responds that EFN was allowed to assign the Agreement because the Agreement is silent on the issue, and cites authorities addressing a lessee's ability to assign a lease in the absence of a limiting language. *See* 18 Ind. Law Encyc. Landlord and Tenant § 46 ("Generally, in the absence of a contractual restriction or prohibition, a lessee may, without the lessor's consent or an express provision in the lease, assign the lease."); *Shadeland Hills*, 2002 WL 31431571, at *4 ("[A]ccording to Indiana law, in the absence of limiting language to the contrary, tenants may freely assign or sublet."). The parties do not cite, and the Court was unable to locate, Indiana case law addressing a lessor's assignment rights where the lease only addresses the lessee's assignment rights. But Indiana courts have found that successor landlords are bound by the terms of leases entered into by their predecessors. *See Castellano v. Wal-Mart Stores, Inc.*, 373 F.3d 817, 820--21 (7th Cir. 2004) (successor landlord was "successor in interest . . . bound by terms of the third amended lease"); *Santa Claus, Inc. v. Santa Claus of Santa Claus*, 27 N.E.2d 354, 357 (Ind. 1940) (enjoining successor landlord from interfering with lessee's possession of premises). Indiana courts have also held that lease agreements run with the land, regardless of whether the lease agreement was assigned. *See Wash. Auto Sales Co. v. People's*

*State Bank*, 194 N.E. 184, 186 (Ind. Ct. App. 1935) (holding that lessee's "covenant to pay rent annexed to the real estate, and appellee, as the holder of title thereto, could recover the rental pursuant to said covenant, although appellee was not mentioned in the lease, and although said lease was not assigned to appellee"). When the Plaintiff acquired the Property from EFN, it became the successor in interest to the Agreement. (*See* Agreement § 18.) As such, vertical privity exists.

Because all three requirements are satisfied, the Agreement is a land use covenant that runs with the land. Therefore, the Court denies the Plaintiff's motion for summary judgment on this issue, and grants the Defendant's motion for summary judgment on Count I.

## C.      Breach of Contract Claim

Count II of the Complaint asserts a breach of contract claim. (Compl. ¶¶ 12--14.) To recover for breach of contract under Indiana law, a plaintiff must prove that "(1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Duncan v. Greater Brownsburg Chamber of Commerce, Inc.*, 967 N.E.2d 55, 57 (Ind. Ct. App. 2012) (citation omitted). The Plaintiff alleges that the Defendant breached section 9 of the Agreement by failing to maintain the Premises in a safe, clean and orderly fashion. (*See* Compl. ¶¶ 12--13.) Section 11 of the Agreement provides that an Event of Default occurs when the Defendant "fail[s] to comply in any material respect with any provision of the Agreement . . . , and such failure shall continue for a period of thirty (30) days after written notice of such default is given" to the Defendant.[8] (Agreement, § 11(1).)

---

[8] The Event of Default provision also addresses the situation where a condition cannot be reasonably be cured within the thirty day period, but may be commenced within the thirty day period and cured within 180 days. (Agreement, § 11(1).) Because the Defendant does not assert that it remedied the alleged breaches within the 180 day period, the Court will not address this issue.

The Defendant contends that there is no actionable breach of the Agreement because the Plaintiff commenced this action within two weeks of notifying the Defendant of the breaches in the Demand Letter, instead of waiting until the Agreement's thirty day cure period had passed. In *Shadeland Hills Development Co. v. Westel-Indianapolis Co.*, the court found no actionable breach of an agreement provision where the plaintiff failed to give a defendant proper notice of default. 2002 WL 31431571, at *3. There, the plaintiff's notice of default was the filing of the complaint itself. The court found that "[t]he notion that a notice-of-default clause in a contract may be satisfied by a lawsuit subverts the entire purpose of these clauses of avoiding unnecessary litigation; nor has opportunity to cure been given where notice of default and the lawsuit arrive in one fell swoop." *Id*. It also relied upon an "analogous line of Indiana cases holding that where notice and an opportunity to remedy defects in sold goods form part of a warranty agreement, they operate as conditions precedent to instituting suit." *Id*. (citing *Aamco Transmission v. Air Sys., Inc.*, 459 N.E.2d 1215, 1217 (Ind. Ct. App. 1984) (collecting cases)).

Here, the Plaintiff provided the Defendant with the Demand Letter on March 19, 2015, asserting that the Defendant was in default for failing to maintain portions of the Premises, and attaching the 2013 and 2015 Assessments. The Defendant hired a contractor who conducted repairs approximately two weeks later, on April 1, 2015. On that same day, the Plaintiff commenced this action. The Plaintiff cites the 2013 Assessment as evidence that the Defendant had been in breach of the Agreement for almost two years prior to filing the lawsuit, and insists that it would be illogical to bar it from asserting breaches of the Agreement that had remained unresolved for years [ECF No. 45 (Pl. Reply) at 4]. The Defendant explains that the 2013 Assessment was prepared at its request before the Plaintiff acquired the Property, and relates to the conditions of lattice towers located on the roof of the building which are not part of the

Premises or other occupant's personal property, and therefore, their condition could not constitute a breach of the Agreement.

Regardless of existence of the 2013 Assessment, the Plaintiff did not trigger the notice of default provision (and the remedies available under section 11(2)) until it provided the Defendant with written notice of the alleged breaches of the Agreement on March 19, 2015. Per the terms of the Agreement, an Event of Default does not occur until the Defendant's failure to comply with the Agreement "continue[s] for a period of thirty (30) days after written notice of such default is given." (Agreement, §11(1).) When the Plaintiff commenced this action on April 1, 2015, the thirty day cure period had not passed, and thus, no Event of Default had occurred. Because the Agreement requires notice and an opportunity to remedy before an Event of Default occurs, they are conditions precedent to commencing an action based on an alleged Event of Default. *See Shadeland Hills Dev. Co.*, 2002 WL 31431571, at *3.[9]

Moreover, the Plaintiff fails to raise a genuine issue of material fact as to whether the Defendant cured the alleged breaches of the Agreement identified in the Demand Letter within the thirty day period. The Defendant relies on the Acknowledgment dated April 1, 2015, to assert that its contractor had completed all maintenance and repairs by that date, and that the improved condition of the building was acknowledged by the Plaintiff. The Acknowledgement states that "Griff EE, Inc. contracted to remove abandoned telecommunications equipment" on the

---

[9] In its reply brief, the Plaintiff mentions in passing that the Defendant's theory (1) appears to be grounded in equitable estoppel and cannot be raised as an affirmative defense in response to a summary judgment motion, and (2) fails to acknowledge the difference between a common law breach of contract and the default provisions of the Agreement. (Pl. Reply at 4.) Because the Plaintiff has not developed any argument on either of these points, they have been waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel.").

Property. [ECF No. 36-9 at 2.] The Plaintiff signed it, "acknowledge[ing] that the photos taken . .
. AFTER performing the contracted site clean-up activities accurately reflect the condition of the
[Property]" on April 1, 2015. (*Id.* (emphasis in original).) The Acknowledgement does not state
that all of the maintenance and repairs required by the Demand Letter were completed, but the
section identifying "any new condition(s) found as a result of the site clean-up activities" was
left blank. (*Id.*) The Plaintiff argues that the Acknowledgment merely documents some activities
by the Defendant's contractor to commence the required maintenance operation, but does not
address the completion of the required maintenance. The Plaintiff insists that the Defendant has
no evidence that the repairs were completed within thirty days.

Kenney, the Plaintiff's managing partner, conceded that "anything pertaining to the
damage of the property . . . ha[d] been remedied" by the time of his deposition in September
2017. (Kenney Dep. at 53.) In his affidavit, Kenney states that the Defendant "commenced some
remedial action within the given time period," and that "a substantial majority of necessary
repairs and maintenance were completed long after the thirty day period allowed by the
[Agreement]." (Kenney Aff., ¶ 3.) Aside from this general statement, the Plaintiff fails to
identify or offer any evidence of repairs or maintenance that were completed after the thirty day
time period. "It is well established that in order to withstand summary judgment, the non-movant
must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory
allegations." *Gabrielle M. v. Park Forest–Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822
(7th Cir. 2003) (emphasis in original; citations omitted); *see Midwest Fence Corp. v. U.S. Dep't
of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016) ("At the summary-judgment stage, the plaintiff . . .
must set forth by affidavit or other evidence specific facts."). Summary judgment is the "put up .
. . moment in a lawsuit, when a party must show what evidence it has that would convince a trier

of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Given that the Plaintiff signed an acknowledgement that repairs were conducted on April 1, 2015, and fails to identify any repairs that were not completed by that date, Kenney's vague testimony as to the timing of the repairs is insufficient to establish a genuine issue of material fact regarding whether the Defendant completed the repairs within the thirty day cure period set by the Agreement. *See Sommerfield v. City of Chi.*, 863 F.3d 645 (7th Cir. 2017) ("Summary judgment is not a time to be coy: '[c]onclusory statements not grounded in specific facts' are not enough.") (quoting *Bordelon v. Bd. of Educ. of the City of Chi.,* 811 F.3d 984, 989 (7th Cir. 2016)).

Finally, citing the Plaintiff's request for "damages resulting from the inability to develop the Building due to Defendant's breach(es) of the Agreement" the Defendant argues that the Plaintiff cannot show that it sustained monetary damages. [ECF No. 36 at 12 (quoting Pl. Interrog. Resp. No. 9).] The Plaintiff responds that it "does not seek to recapture monetary damages in this lawsuit," but rather, requests ejectment based on the Defendant's default and termination of the Agreement. (Pl. Resp. at 7 n.2.) Accordingly, the Court deems the Plaintiff's claim for damages abandoned. *Palmer.*, 327 F.3d at597.

For the reasons set forth above, the Court grants the Defendant's motion for summary judgment on the Plaintiff's breach of contract claim.

### D.    Ejectment Claim

Count III of the Complaint asserts a claim for ejectment based on material breaches of the Agreement as stated in Count II. (Compl. ¶¶ 15--17.) The Defendant argues that because there is no breach of the Agreement, the Plaintiff has no basis for its ejectment claim. The Court agrees.

Because the Court grants summary judgment on the breach of contract claim, the ejectment claim similarly fails.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 35], and DENIES the Plaintiff's Cross-Motion for Summary Judgment [ECF No. 39]. The Clerk is DIRECTED to enter judgment in favor of the Defendant.

SO ORDERED on September 18, 2018.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT